UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDY FLUMMERFELT, *et al.*,

    Plaintiffs,

v.

CITY OF TAYLOR, *et al.*,

    Defendants.

_____/

Case No. 22-10067

F. Kay Behm
United States District Judge

**OPINION AND ORDER GRANTING THE AWAD DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 171) AND
DENYING MOTION TO STRIKE EXPERT AS MOOT (ECF No. 173)**

**I.    PROCEDURAL HISTORY**

Defendants Shady Awad, Realty Transition LLC and Taylor Rehab Two, LLC (the Awad Defendants), bring their motion for summary judgment on the RICO claims asserted against them. (ECF No. 171). Plaintiffs filed a response and the Awad Defendants filed a reply. (ECF Nos. 185, 195). The Awad Defendants also filed a motion to strike expert reports and preclude the testimony of Kurt Salvatore. (ECF No. 173). The court held a hearing on February 26, 2025. For the reasons set forth below, the court **GRANTS** the Awad Defendants' motion for summary judgment. Given the court's decision on the motion for summary

1

judgment in the Awad Defendants' favor, it **DENIES** the motion to strike expert reports and preclude testimony as **MOOT**.

## II.    FACTUAL BACKGROUND

Defendant Awad was working as an automotive engineer when, while still working his full-time job, he decided to go into real estate, starting with the purchase, rehabilitation, and lease of a single house in the City of Dearborn in 2002.  (ECF No. 180-1, Ex. A, Awad Dep., at 7-8).  Between 2009 and 2014, he purchased approximately 75 homes in Taylor, Allen Park, Dearborn, Dearborn Heights and Southgate.  *Id*. at 12-13.  Defendant Awad is the owner of Defendant Realty Transition LLC and Defendant Taylor Rehab Two, LLC.

Plaintiff Flummerfelt inherited property in the City of Taylor in 2003.  (ECF No. 180-2, Ex. B, at 41).  She started falling behind on real estate taxes in the 2006 tax year, and was nearly foreclosed for nonpayment of both 2010 and 2011 taxes, each time redeeming the property before title vested in the County.  (ECF No. 180-3, Ex. C).  However, she did not pay her 2012 or 2013 taxes, and on June 9, 2015 Wayne County foreclosed and took title to the property.  (ECF No. 180-4, Ex. D, Foreclosure Judgment).

Plaintiff Ridenour inherited property in Taylor in 1990. (ECF No. 180-5, Ex. E, at 8).  The property had tax problems nearly every year between 2001 and

2015. (ECF No. 180-6, Ex. F). It was redeemed from foreclosure in six different years, before a foreclosure judgment was entered and title vested in Wayne County on March 31, 2015. (ECF No. 180-7, Ex. G, Foreclosure Judgment).

The Hamilton Plaintiffs purchased a home in Taylor in 2007. (ECF No. 180-8, Ex. H at 7). They first got behind on taxes in 2014, but redeemed the property before title transferred to Wayne County. (ECF No. 180-9, Ex. I). 2015 taxes were not paid, and a foreclosure judgment vesting title in Wayne County was entered in June 2018. (ECF No. 180-10, Ex. J).

According to Defendants, the properties were in poor condition at the time of foreclosure. The Flummerfelt home was essentially gutted, including stripping and replacing the faux brick siding, replacing doors and windows, and tearing out and replacing most of the interior. (ECF Nos. 180-17, 180-18; Exs. Q, R). The Hamilton property was also in poor condition. (ECF No. 180-19, Ex. S). The Ridenour property was ultimately demolished. (ECF No. 180-1, Ex. A, Awad at 103) ("The city notified me to tear down the house…. [the] building inspectors said [it] had to come down.").

The City of Taylor had a number of tax foreclosures in 2013 and 2014. (ECF No. 180-11, 180-12, Exs. K, L). In 2013, only 30% of foreclosed properties were auctioned for more than the taxes owed. *Id*. In 2014, the number was 41%. *Id*.

3

Taylor started its Right of First Refusal (ROFR) program in 2015. (ECF No. 180-13, Ex. M, Council Minutes). Accordingly to Mr. Awad, based on his reputation for he had already done in Taylor and surrounding communities, he was "asked to look at" the program. (ECF No. 180-1, Ex. A at 21). City officials asked Mr. Awad to give them a tour of homes that he had rehabilitated in Taylor and other communities. *Id*. at 25. Mr. Awad then received an invitation to present and interview to be selected as the developer for the 2015 program. (ECF No. 180-14, Ex. N). On July 8, 2015, he and his attorney presented to a committee of 15 individuals from the City, including Taylor's Mayor and many department heads. (ECF No. 180-1, Ex. A at 30). This was the first time he met Mayor Sollars. *Id*. at 31-32. Mr. Awad was not the only developer asked to interview. Another developer, James Budziak, also presented. (ECF No. 180-20, Ex. T, Interrogatory Response ¶ 6). According to Awad, by the time he was involved, Taylor had already selected the properties for the program. (ECF No. 180-1, Ex. A, at 114) (In 2015 they asked me if I was interested, they sent me properties to look at and make a proposal…. [I]t was a lot of properties that we had to look at …").

Taylor City Council approved the purchase of the properties in its 2015 ROFR program (including the Flummerfelt and Ridenour properties), and also voted to select Realty Transition as developer, at its public meeting on July 20,

2015.  (ECF No. 180-13, Ex. M).  Awad negotiated a development agreement with Taylor's City Attorney.  (ECF No. 180-1, Ex. A at 67).  Realty Transition was responsible under the agreement for "the rehabilitation and maintenance of the Homes" under a "rehabilitation plan" approved by the City.  (ECF No. 180-15, Ex. O at § 1.2, 2015 Agreement).  Realty Transition could not receive title to the properties until it had rehabilitated them and obtained a certificate of occupancy.  *Id*. at § 1.3.  Realty Transition had to post $500,000 in escrow to secure its obligations.  (ECF No. 180-15, Ex. O, Escrow Agreement).

Wayne County deeded the Flummerfelt and Ridenour properties to Taylor on August 26, 2015.  (ECF No. 180-30, 31, 32; Exs. W1-W3, Deeds).  Taylor deeded them to Realty Transition in January, 2016.  *Id*.  The Flummerfelt property was subsequently deeded to Defendant Taylor Rehab Two LLC in February, 2017.  *Id*.  The Ridenour property was deeded to non-party Taylor Rehab Six, LLC around the same time.  *Id*.

As the U.S. Attorney put it in her Sentencing Memorandum in the underlying criminal case, in the second half of 2016 Shady Awad "found himself between a rock and a hard place.  He had walked away from his career as an engineer to become a real estate developer…. [He] had invested millions of dollars … but faced many issues with the City." (Case No. 2:19-20836, ECF No.

173, PageID.2268).  Facing financial ruin, Awad decided that he could gain an "easier path" by "giving into Mayor Sollars' repeated solicitations for … items of value."  *Id*. at PageID.2269.  Awad testified that the City started to squeeze him as he was trying to perform the ROFR contract.  "[W]e were heavily invested in the city, and we were in dire straits."  (ECF No. 180-1, Ex. A at 56).  "Once we started rehab, we had lots of failed inspections, lots of ordinance tickets, and anything – any eviction … every sale … every escrow had to be signed off by the mayor.  Everything in the program had to be signed off by the mayor."  *Id*.  Awad explained that "I asked [Sollars] if they could please just follow the contract … [In] the third or fourth quarter [of 2016] … he asked … if I could recommend a contractor … to do his hardwood floors."  *Id*. at 56-57.  "Nowhere did I know any of this was going to be any different that referring a contractor like I've done to many people."  *Id*. at 60.  However, "eventually … I came to realize [sometime in December, 2016] that I'm not getting paid for any of this stuff….[H]e doesn't have any intent to pay this back."  *Id*. at 60-61.  "I didn't know what to do, and I should have contacted the FBI."  *Id*. at 61.  Instead, Mr. Awad chose to continue giving in to Sollars requests so that he would "remove the artificial roadblocks that [Sollars] was putting into place and … to be able to stay in the program and to have an advantage over other companies … that the city already had and was

6

putting it out for bid." *Id*. at 62.  Awad pleaded guilty to bribery and took responsibility for his conduct.  The Government's sentencing memorandum acknowledges that "Mr. Awad consistently expressed sincere remorse for his conduct and provided the Government with important information and documents that substantially assisted their investigations … [and] directly led to other defendants accepting plea deals." (Case 2:19-20836, ECF No. 172, PageID.2191).

Defendants maintain that there is no evidence that the bribery occurred before July 2016 and there is no evidence that Defendants were complicit in any illegal conduct with regard to the 2015 Taylor ROFR program.  Mr. Awad testified that in "2015, we received that contract on our own." (ECF No. 180-1, Ex. A, p. 62).  Plaintiffs dispute this and point to the following evidence.  Prior to Taylor obtaining title to Plaintiffs' properties, Taylor and/or Sollars entered into agreements with the Awad Defendants to rehabilitate the properties, and pay all fees associated with the rehabilitation.  (ECF No. 185, Exhibit A – Escrow Agreement, Exhibit B - Development Agreement).  Prior to the acts of bribery in 2016, Awad and Sollars were actively negotiating the development and escrow agreement.  (ECF No. 185, Exhibit C – First Amended Development Agreement, Exhibit D – Second Amended Development Agreement).  Plaintiffs claim that

Awad pleaded that the RICO scheme occurred between 2015 - 2019.  (ECF No. Exhibit E - Shady Awad Plea Agreement at p. 3).  However, the plea agreement specifically says that the other participants in the conspiracy (Sollars, Baum, and Sollars campaign fund) participated between 2015 and 2019.  It further states that Mr. Awad "joined the conspiracy" "beginning in 2016." *Id*. at p. 4.  It also provides that on July 20, 2015, in furtherance of the conspiracy, Sollars recommended that Awad's company be awarded all of the tax-foreclosed properties that Taylor had or would acquire under its ROFR program. *Id*. at p. 6.  Awad also pleaded that Sollars recommended to the City of Taylor, "without a legitimate bid process[,]" that Awad be awarded the properties. *Id*. at 6.  Additionally, Awad agreed to advance Taylor's purchase price for the properties. (ECF No. 185-6, Ex. F – Awad Deposition pp. 65-66).  Lastly, Plaintiffs maintain that Awad and Sollars were negotiating the development agreement prior to July 20, 2015. *Id*. at 67-68.[1]

The only property in this case foreclosed and sold after the onset of the

---

[1] Plaintiffs point to the following testimony from Mr. Awad:

> Q: So you were negotiation this [the development agreement] with the mayor prior to July 20th, 2015?
> A: The City of Taylor had Howard & Howard representing them, Gus Andreasen, and that's who we spoke with in regards to the contract.

(ECF No. 185-6, p. 67).

8

bribery is the Hamilton property.  In 2018, the City solicited bids for the ROFR program, and at least eight interested developers responded.  (ECF No. 180-22, 23, 24 25, 26, 27, 38, 29; Exs. V1-V8 (Proposal Cover Pages Only).  The proposals were evaluated and interviews of qualified responders were conducted.  (ECF No. 180-20, Ex. T, ¶ 6).  Realty Transition (and its affiliates, including Taylor Rehab Six, LLC) was awarded a contract by unanimous vote of Taylor City Council.  (ECF No. 180-13, Ex. M, 2018 Minutes).  The Hamilton property was included in the 2018 ROFR program.  (ECF No. 180-15, Ex. O).  Taylor obtained title to the Hamilton property on August 10, 2018.  (ECF No. 180-30, 31, 32; Exs. W1-W3).  It transferred the property to non-party Taylor Rehab Six, LLC (another of Mr. Awad's entities) on August 21, 2018.  *Id*.  Defendant Realty Transition LLC is not in the chain of title for this property.

## III.     ANALYSIS

### A.     Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B)

showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party need only demonstrate the

minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses

11

tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

### B.     Proximate Causation

Plaintiffs must be persons "injured in [their] business or property by reason of a [RICO] violation." 18 U.S.C. § 1964(c). The language "by reason of" makes proximate cause "an essential ingredient" of any civil RICO claim. *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013); *see also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267-68 (1992). The "central question" for proximate causation is "whether the alleged violation led directly to plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "But for" causation is insufficient. *Id*. at 456-57. According to the *Holmes* court, "proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *see also Anza*, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts."); *Trollinger v. Tyson*

*Foods, Inc.,* 370 F.3d 602, 612–13 (6th Cir. 2004) (Standing and proximate cause "both grow out of the 'by reason of' limitation in RICO—namely, the requirement that claimants establish that their injury was 'by reason of' a RICO predicate act violation.").

Defendants argue their conduct was not the proximate cause of Plaintiffs' injuries because the County's foreclosures caused Plaintiffs' injuries and thus causation here is too attenuated. As explained in *Holmes*, a civil RICO plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id*. at 268. Proximate cause for RICO purposes must be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, at 268). A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id*. at 9 (quoting *Holmes*, at 271, 274). The concept is flexible but "the causal link between the injury and the conduct may [ ] be too weak to constitute proximate cause [if] it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614 (6th Cir. 2004).

*Hemi* is instructive. Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. *Id.* Without the reports from Hemi, the State could not pass on the information to the City. *Id.* Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. *Id.* Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. *Id.* The City thus could not pursue those customers for payment. *Id.* The City was injured in the amount of the portion of back taxes that were never collected. *Id.* The Court found causation "attenuated," and "far too indirect," because the claim could not meet "RICO's direct relationship requirement." *Id*. at 10-11. More specifically, "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file … reports. Thus … the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id*. at 11.

Here, the conduct that caused Plaintiffs' harm – the taking of Plaintiffs' equity by the County – was the foreclosure conducted by Wayne County. Before 2020, the Michigan General Property Tax Act did not provide for the return of excess proceeds or equity to foreclosed property owners. As explained in *Rafaeli v. Oakland Cty.*, 505 Mich. 429, 442 (2020), the GPTA did not provide for any

14

disbursement of the surplus proceeds to the former property owner and did not provide former owners a right to make a claim for these proceeds. As explained by Michigan Court of Appeals, at the moment the County foreclosed on the plaintiffs' properties, by statute the plaintiffs' equity was essentially erased, and "[re]gardless of what occurred [afterwards], no money was ever going to be paid to plaintiffs." *Jackson v. Southfield Neighborhood Revitalization Init.*, --- Mich. App. ----; 2023 WL 6164992, at *22 (Mich. Ct. App. Sept. 21, 2023). There, no civil conspiracy claim could lie because all the damage to Plaintiffs was done when the County acted and that "could not have changed regardless of the subsequent actions of the city and the corporate defendants." *Id*. Similarly here, once the County foreclosed, Plaintiffs suffered their injuries and nothing in the bribery scheme changes that fact. And like in *Hemi*, the conduct that caused the harm – the foreclosure – is conduct entirely distinct from the conduct giving rise to the bribery.

Plaintiffs contend that the Awad Defendants' conspiracy was to steal the Plaintiffs' equity and that Plaintiffs were direct victims. However, Plaintiffs' equity was already "stolen" at the point of foreclosure. And the Awad Defendants were not involved in any decision to foreclose the properties. That decision rested in the hands of Wayne County, who is not alleged to be a co-conspirator. The harm

15

was done at the point of foreclosure because that is the point at which Plaintiffs lost their equity, and subsequent events, including Taylor's exercise of its right of first refusal and the Awad Defendants engaging in a bribery scheme, could not be the proximate cause of Plaintiffs' loss of equity. Whether Wayne County exercised its right of first refusal, sold the property at public auction, or Taylor exercised its right of first refusal does not change the fact that Plaintiffs' right to the equity was extinguished by the foreclosure itself. Accordingly, causation is too attenuated and Plaintiffs' RICO claims must fail for lack of proximate cause.

**V.    CONCLUSION**

For the reasons set forth above, the court **GRANTS** the Awad Defendants' motion for summary judgment and **DENIES** the motion to strike expert as moot.

**SO ORDERED**.

Date: March 6, 2025                    s/F. Kay Behm
                                       F. Kay Behm
                                       United States District Judge